KASS HARSTAD (Bar No. 8419)
ERIKA BIRCH (Bar No. 7831)
CHAD JOHNSON (Bar No. 10101)
**STRINDBERG & SCHOLNICK, LLC**
1516 W. Hays Street
Boise, ID 83702
tel: 801.359.4169
fax: 801.359.4313
kass@utahjobjustice.com
erika@idahojobjustice.com
chad@idahojobjustice.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **RHONDA COCHRANE**, <br><br> Plaintiff, <br><br> vs. <br><br> **WALMART, INC.,** a Delaware corporation, <br><br> Defendant. | **COMPLAINT AND JURY DEMAND** <br><br> Case No. <br><br> Judge: |

Plaintiff Rhonda Cochrane, ("Employee", "Plaintiff", or "Ms. Cochrane"), by and through her attorney, hereby complains against Defendant Walmart, Inc. ("Walmart" or "Defendant"), as follows.

## I.   PRELIMINARY STATEMENT

1. This suit is brought by Rhonda Cochrane, a female employee of Walmart employed from 2000 to 2005 who was subjected to gender discrimination by Defendants in violation of Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq*. ("Title VII").

2. Plaintiff seeks all available remedies including damages, attorneys' fees, costs, and interest, and compensatory damages.

3. Over fifteen years ago, the Dukes v. Wal-Mart class action commenced as a national class against Wal-Mart Stores, Inc., the largest retailer in the world and the largest private employer in the United States. The action alleged that female employees in Wal-Mart and Sam's Club retail stores were discriminated against based on their gender, with respect to pay and promotion to management track positions, in violation of Title VII.

4. In 2004, the United States District Court for the Northern District of California certified a national class of female employees challenging retail store pay and management promotion policies and practices under Fed. R. Civ. P. 23(b)(2). On June 20, 2011, the United States Supreme Court reversed that class certification order, holding that the national class could not be certified based on the facts in the record.

5. On June 24, 2011, the plaintiffs in Dukes moved to extend tolling of the statute of limitations in the Northern District of California. On August 19, 2011, the court granted plaintiffs' motion in part and extended the tolling period awarded to former class members under American Pipe and Construction Co. v. Utah, 414 U.S. 538, 554 (1974) for a limited time, and set forth the dates by which former class members had to file Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6. All former class members who had never filed an EEOC charge had until May 25, 2012, to file charges in states with 300 day limits.

7. The relevant time period in this action for Plaintiff's claims is based on the limitations period from Dukes.

8. In accordance with these deadlines, Ms. Cochrane filed a Charge of Discrimination with the EEOC on May 20, 2012, alleging sex discrimination.

9. The EEOC issued Ms. Cochrane's individual right to sue notice on September 23, 2019, and Ms. Cochrane received the notice September 26, 2019. Ms. Cochrane has filed this Complaint within the 90 days.

10. Ms. Cochrane has therefore exhausted her administrative remedies and complied with the statutory prerequisites of Title VII by timely filing EEOC charges of discrimination.

## II. PARTIES

11. At all times relevant to the Complaint, Ms. Cochrane resided in the State of Idaho, and she was employed by Walmart at Store # 2862 in Meridian, Idaho from 2000 to 2005 and then again for a few weeks in 2008.

12. Defendant Walmart is a massive corporation, incorporated under the laws of Delaware, operating within the State of Idaho during all times relevant to this complaint.

13. In February of 2018, Walmart changed its name from Wal-Mart Stores, Inc. to Walmart, Inc.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Ms. Cochrane is bringing claims for violations of federal law.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because all of the employment practices alleged to be unlawful were committed within the jurisdiction of this Court.

## IV. GENERAL ALLEGATIONS

### Organizational Structure and Hierarchy

16. In the time period relevant to this lawsuit, Walmart retail operations were divided geographically into six Walmart divisions, each consisting of approximately six regions. Each region was split into multiple districts. Approximately seven to ten stores were assigned to each district.

17. All stores typically had the same or similar job categories, job descriptions and management hierarchy. At the bottom of the ladder, the primary entry-level hourly positions were Cashier, Sales Associate, and Stocker.

18. The first step above an entry-level job was an hourly supervisor position, including Department Manager, Customer Service Manager and Support Manager. The next step up was Management Trainee ("MIT"), a four-to-five-month program that prepared employees to be Assistant Managers, a salaried position. Each store had several Assistant Managers. The next level was Co-Manager, a position used only in larger stores, and then Store Manager.

19. From 1998-2004, Store Managers set pay for hourly employees following guidelines governing compensation. Each Store Manager reported to their District Manager, and in order to maintain a consistent administration of the pay guidelines, certain hourly pay decisions were reviewed by the District Manager for approval. Specifically, exceptions to the pay guidelines, as well as some actions within the Guidelines (such as setting starting pay more than 6% above the minimum rate) were reviewed by the District Manager, who had to decide whether or not to approve the Store Manager's pay decision. Thus, the Store Managers received regular feedback from the District Managers about their decision making.

20.     District Managers reported to the Regional Vice President ("RVP"). In addition to the formal feedback from District Managers to Store Managers through the hourly pay exception process, both the RVP and District Managers spent a large amount of time touring stores and talking with the Store Managers in those stores. Similarly, the RVP held regular in-person meetings and conference calls with all the District Managers. These regular meetings touched on many aspects of store operations, including people issues. Thus, there was a constant stream of communications with district and regional management that provided feedback to Store Managers about their hourly compensation decisions and guidance about how Walmart regional management expected them to carry out their responsibilities.

21.     The RVP also had overall responsibility for pay increases for Assistant Managers and had influence over promotions into MIT positions.

22.     Each Region also had at least one Regional Personnel Manager ("RPM"), who was responsible for promotion into the MIT program and starting pay for MIT and Assistant Managers.

## Pay Discrimination

*1998 – June 2004*

23.     During the early years of Ms. Cochrane's employment (prior to June 2004), Walmart set compensation of store-based employees using a common set of guidelines, which Walmart's managers applied consistently. The pay guidelines established basic standards for setting pay rates at hire and subsequent pay adjustments for hourly and salaried employees.

24.     From 1998 through June 2004, Walmart assigned jobs to five classes, the top two of which were only used for a few specialty jobs. Jobs were assigned to the same class regardless of department. Each successive job class had a higher minimum starting pay rate.

25. The minimum pay levels at hire ("start rates") for each job category were established for Store Number 2862 with the approval of the applicable District Managers and RVP. Thereafter, an employee's pay level could be adjusted: (1) after an initial probationary period; (2) if the employee was promoted to a higher job class or into management; (3) on an annual basis, if the employee satisfied minimum performance standards; or (4) if the employee had been awarded a special "merit" raise.

26. The Store Manager had the initial responsibility to set pay rates for individual hourly employees within the pay guidelines, subject to constraints set by the District Manager and RVP. Where a Store Manager set a pay rate above or below the pay guidelines, the rate was called an "exception."

27. The pay rate for a new employee could be set up to a maximum of $2 per hour above the start rate, but if the new employee's rate was more than 6% above the established start rate for that pay class, a computer program in the payroll system would prohibit payment at this rate unless and until the Store Manager manually entered the pay rate for that employee.

28. All hourly pay exceptions were automatically reported to the District Manager, who could approve or disapprove such exceptions. The RPM was also informed of all hourly pay exceptions and was required to ensure that hourly compensation was consistent among employees in the Region.

29. In Store Number 2862, District Managers, the RPM, and the RVP regularly received reports of all employees whose hourly pay in a job category was more than 10% below or 5% above the average pay in that category. District Managers performed quarterly audits of each store's compliance with company policies and Region-specific policies, including compensation policies, which were then reported to the RPM and RVP.

30. District Managers and the RVP had ultimate authority over whether, and by how much, to adjust the pay of hourly employees, including those employees listed on exception reports.

31. In Store Number 2862, managers were not required to use job-related criteria, such as job performance or experience, in setting, adjusting, or approving compensation for individual employees. Managers did not document the reason for setting, adjusting, or approving the compensation of individual employees. The RVP and District Managers did not hold the Store Managers in Store Number 2862 accountable for the factors the Store Managers used in making pay decisions or in ensuring those factors comported with the law, nor did they require any documentation of the reasons for the compensation paid to individual employees. Nor did Walmart managers specify the weight to be accorded any particular requirement in setting or adjusting compensation.

32. Walmart's compensation policies that were in place until June 2004 – including its policies of using a set of prescribed factors to set starting pay for hourly associates at a pay rate above the minimum rate, granting discretion to Store Managers to set starting pay, permitting them to evaluate and weight the prescribed factors as they chose, failing to require those Store Managers to document the reasons for setting starting pay and merit increases as they did, and setting pay adjustments based on the associate's prior pay – have had an adverse impact upon its female employees.

33. Until June 2004, the RPM, RVP, and District Managers received regular reports about compensation for hourly and salaried employees, showing that female employees were paid less than men on average. These managers therefore had knowledge of the compensation discrimination present in the stores over which they had authority.

*June 2004 - 2013*

34. In June 2004, Walmart introduced a new pay structure, in which many jobs which had previously been in one pay class were assigned to separate classes depending on department. Pay rates differed depending on the pay class in which an hourly employee worked, and therefore the department in which that hourly employee worked.

35. The proportion of women in Walmart's departments varied greatly. Many jobs in departments in which women were over-represented were assigned to lower job classes, while those same job titles in departments over-represented by men were assigned to higher job classes. Walmart's 2004 pay restructuring had an adverse impact on its female employees.

36. In 2005, Walmart started giving newly hired employees "credits" for prior work experience. Because each credit was worth more to employees in higher job classes, the application of this credit policy exacerbated the pay disparities and had an adverse impact on female employees.

37. Then, in 2006, Walmart added a cap on the pay permitted for each job class, further impacting the pay of women relegated to the lower job classes, which had lower pay caps. This also had an adverse impact on female employees.

38. Though Walmart made changes to its pay rates and pay decision-making structure, Walmart continued to discriminate against women by paying them less than their male counterparts throughout Ms. Cochrane's period of employment.

39. As a result of the policies referenced above, women who held hourly positions in Store Number 2862 were regularly paid less than similarly-situated men, although, on average, those women had more seniority and higher performance ratings than their male counterparts. This pay disparity occurred both before June 2004 and thereafter.

**Promotion Discrimination**

40. *Management Track Positions Below Assistant Manager* - Support managers are the highest level hourly supervisory positions at Walmart. Support managers assume the duties of Assistant Managers in an Assistant Manager's absence. Employees in these positions are often groomed for further advancement. The vast majority of support manager vacancies are not posted or otherwise communicated to hourly associates within the store. There has been no formal application process for selection for these positions, and no job-related criteria for selecting employees for promotion to support manager. Additionally, although it is not a true "management" position, department manager is often a necessary step for employees hoping to work their way into salaried management. Women applying for department manager positions are often subjected to severe gender stereotyping, and are rejected out of hand for most openings in "masculine" departments such as sporting goods, hardware, etc.

41. *Promotion to Management Trainee* - Entry into the MIT Program is a requirement for advancement into Assistant Manager and other salaried management positions. Prior to 2003, there was no application process or job posting for MIT positions. Hourly employees were not provided any information regarding how to enter management, or what the requirements or qualifications were for entering management, or how to apply for the MIT Program.

42. Walmart's established criteria for the MIT program prior to 2003 included willingness to relocate. Willingness to relocate was a factor known to deter women from pursuing such positions and which Walmart executives acknowledged was not justified by business necessity.

43. In January 2003, Walmart instituted a posting system for entry into the MIT Program. This system was used through 2006, and positions were posted for one week, a few times per year. This posting system required candidates to agree to certain job conditions, including (1) assignment to a store up to a one-hour drive from home; (2) travel for up to six weeks; and (3) replacing the requirement that all candidates be willing to relocate with a statement that the greater geographic area an individual would move to, the more likely they would be promoted. All three factors would be more likely to discourage women than men, in a manner similar to the prior relocation requirement. Notably, travel assignments were filled on a voluntary basis, so stating that six weeks of travel would be required was not a fair representation of the actual job requirements.

44. Starting in 2007, Walmart began using a new system for all management promotions, including MIT. This system permitted employees to register in advance for the positions and geographic areas in which they were interested. Every vacancy was expected to be posted with a "requisition" which automatically applied the minimum qualifications Walmart required for the position to the group of those who had expressed interest in the position within that geographic area, and presented the hiring manager with a set of candidates. It was particularly common for managers to post a position, see who the candidates were, and then close the posting without selecting anyone because the manager's pre-chosen candidate was not included in the pool ("pre-selection").

45. Both before and after Walmart posted MIT positions, the selection process involved screening by District Managers and approval of selections by the RPM. In 2003, in addition to posting, Walmart adopted standardized interview questions, which it used through 2009.

46. The District Managers and RPM were provided uniform guidelines setting minimum eligibility criteria for promotion into the MIT Program, including minimum tenure, age (18 years or older), absence of current "active" discipline, satisfactory recent performance evaluations, and willingness to relocate. Yet no job-related criteria were required for selecting individuals from the pool of employees who meet these minimum criteria.

47. Employees selected into the MIT Program are required to transfer from their stores and often their districts as they enter training and Assistant Manager positions, subject to very limited exceptions that must be approved by the RPM and RVP.

48. Despite the changes to the MIT promotion process, two things remained consistent barriers to women: (a) a refusal to post or a system to circumvent the purpose of posting to choose a preferred candidate identified prior to posting ("pre-selection"); and (b) requiring candidates to be willing to relocate, or to accept comparable conditions on travel and commuting distance. These policies had a disparate impact on female candidates.

49. Management-track promotional policies and practices have denied interested and qualified women equal access to promotional opportunities because such opportunities are not posted, there is not an open application system, and employees are not informed of the criteria for promotion. Moreover, managers do not require or use valid, job-related factors in making the promotion selections within the Region. Nor does Walmart specify the weight that should be accorded any requirements for promotion. As a consequence, qualified women have been denied equal access to promotions because of their gender.

50. Managers have not documented, and Walmart has not tracked, the reasons for selecting particular employees for promotion into management. Managers have not documented,

and Walmart has not tracked, which employees have been denied consideration for promotion because of their inability to comply with these relocation, travel, and scheduling requirements.

51. Walmart's policies, including its failure to require managers to base promotion decisions for individual employees on job-related criteria, its refusal to post job openings, and the conditions placed on applicants for the MIT program that they be willing to relocate, have had an adverse impact upon its female employees.

52. *Promotion to Co-Manager* - The RVP, with input from RPM and District Mangers, selects Co-Managers. The majority of Co-Manager promotions are transfers across district lines. Co-Manager openings were rarely posted and there was no formal application process for such positions during many of the relevant years. While there have been minimal eligibility requirements for promotion to Co-Manager, such as satisfactory performance and willingness to relocate, there are no job-related criteria for making selections among those who meet the minimum criteria or for determining which store to assign to a Co-Manager.

53. Female have also been far less likely than their male counterparts to receive promotion to management track positions, including support manager, MIT and Assistant Manager, Co-Manager, and Store Manager positions, despite the fact that they have had equal or better qualifications than male counterparts who have been promoted.

54. Female employees must also wait significantly longer to be promoted into management track positions than men with equal or lesser qualifications.

55. Walmart management has long known about gender disparities in promotion and has failed to take appropriate remedial action. Walmart management thus had knowledge of the promotion discrimination present in the stores over which it had oversight.

56. Every store, District and Region regularly compiles and reports to corporate headquarters the gender composition of its hourly and managerial workforce, employee turnover, exceptions to promotion policies, job posting data, entry into MIT programs, and other data. District Managers, the RPM, and the RVP regularly receive these reports.

57. Walmart's People Division regularly prepares reports for senior management summarizing promotion and incumbency rates for store management positions by gender, and reports are regularly made to the Board of Directors.

58. District Managers, the RPM, and the RVP normally visit stores regularly and are aware of the gender composition of the workforce.

59. Senior management officials, senior People Division officials, and outside consultants have warned Walmart that women are not sufficiently represented in management positions, that women are paid less than male employees in the same jobs, and that Walmart lags behind its competitors in the promotion of women to management positions.

60. These officials and consultants have also identified policies and practices at Walmart that have an adverse impact on its female employees, including lack of consistent job posting, the requirement of relocation as a condition of entry into and promotion through management, reliance on stereotypes in making pay and promotion decisions, lack of objective criteria for making promotion decisions, and lack of consistent and reliable scheduling for management level employees.

61. Walmart's founder, Sam Walton, conceded in 1992 that Walmart's policies, particularly its relocation requirement, were an unnecessary barrier to female advancement, yet this policy remained in place thereafter.

62. Senior Walmart managers also blocked policy changes that would have reduced the impact of Walmart's discriminatory policies, including posting of managerial vacancies.

63. Walmart had never studied or analyzed whether any of its practices were consistent with business necessity or whether less discriminatory alternatives to these policies and practices could be adopted.

### Walmart Managers' Reliance on Discriminatory Stereotypes

64. In the absence of job-related compensation criteria, Walmart's managers in Store Number 2862, and those supervising that store, relied on discriminatory stereotypes and biased views about women in making pay and promotion decisions.

65. A 1998 survey of Walmart managers revealed that there was a "good ol' boy philosophy" at Walmart, that many managers were "close minded" about diversity in the workplace, and that some District Managers "don't seem personally comfortable with women in leadership roles."

66. The findings of the 1998 survey echoed an earlier 1992 report by a group of female Walmart management employees, who identified a number of concerns for women employees, including the following: "Stereotypes limit the opportunities offered to women," "[c]areer decisions are made for associates based on gender," "[a]ggressive women intimidate men," "men are interviewed as the replacements, women are viewed as support," and "[m]en's informal network overlooks women."

67. All Walmart Store Managers have been required to attend training programs at the company's Walton Institute. These managers were advised at the Institute that the reason there are few senior female managers at Walmart is because men were "more aggressive in achieving

those levels of responsibility" than women. Managers were cautioned that efforts to promote women could lead to the selection of less-qualified women over more-qualified men.

68. On or about January 24, 2004, at a meeting of all Walmart District Managers presided over by Walmart's CEO Thomas Coughlin, the District Managers were told that they were the key to running the stores: "You are the culture." The key to success was described as "single focus to get the job done. . . . Women tend to be better at information processing. Men are better at focus single objective. Results driven." The District Managers were instructed to create a "culture of execution" and a "culture of results" as they picked "[f]uture leaders."

69. In deciding which employees to promote as department managers — hourly positions which were often stepping stones into salaried management — Store Managers in Store Number 2862 would often consider women only for "female" departments, such as health and beauty, jewelry, softlines, and the service desk.

70. Managers in Store Number 2862, and managers who supervised that store, justified denying promotions to women or paying them less than their male employees because of perceived family obligations of the women and male responsibility to support their families or because of their presumed inability to relocate.

### **Walmart's Ineffective Anti-Discrimination Efforts**

71. For many years, Walmart had no meaningful policies or practices to hold managers in, or managers supervising, Store Number 2862 accountable, financially or otherwise, to equal employment and diversity policies and goals.

72. Starting in 2000, Walmart asked District Managers to set diversity "goals" for advancement of women in management. The goals were based on each manager's individual views on what was attainable and were not tied to any objective measures of availability or

qualifications. Prior to 2004, failure to meet diversity goals had no financial or other consequence for managers in, or managers supervising, Store Number 2862.

73. As late as 2003, Walmart CEO Coughlin was not aware of any diversity goals or whether managers had met such goals. Many Store Managers were also unaware of the existence of any diversity goals.

74. Until at least 2003, there had never been any diversity goals set for individual stores, or for any compensation practices in Store Number 2862.

## Ms. Cochrane's Employment at Walmart

75. Walmart discriminated against Ms. Cochrane because she is female.

76. Ms. Cochrane was hired at Walmart Store Number 2862 in October of 2000.

77. When Ms. Cochrane was hired at Walmart, she started working in the food department, specifically in the grill.

78. After about eight months, Ms. Cochrane began interested in seeking a management position.

79. Ms. Cochrane took the tests required to be considered for management, and passed all necessary tests.

80. After Ms. Cochrane passed the tests required for management, she began asking her managers about being promoted, and she specifically asked to be transferred out of the food department.

81. After Ms. Cochrane's repeated requests, the store manager, James Miller, finally transferred her to a cashier position, but he still did not consider her for a promotion.

82. After Ms. Cochrane was moved into a cashier position, she repeatedly asked to be promoted into a customer service and/or a lay away position. She knew both of these were commons steps to becoming an Assistant Manager

83. When Ms. Cochrane sought promotion to customer service and/or lay away, she had a conversation with Mr. Miller in which he told her she would never be anything more than a cashier.

84. In Ms. Cochrane's later years as a cashier, she received recognition as a great employee. Indeed, Ms. Cochrane received a burgundy vest and badge that was meant to recognize her extra effort.

85. Despite this recognition, Mr. Miller refused to consider Ms. Cochrane for a promotion.

86. While working as a cashier, Ms. Cochrane got paid approximately $8.00 per hour.

87. It was common knowledge at the Meridian store that female employees made less than male employees, and her male counterparts would often brag about making more money than she made.

88. For example, on one occasion, Ms. Cochrane had a conversation with a male cashier named Ryan (last name unknown) about her pay.

89. Ryan had a reputation for not doing his part while on the job, and he often avoided hard work. Despite this, Ryan made more money than Ms. Cochrane, and he found it humorous that Ms. Cochrane and other women were not making as much money as him.

90. During Ms. Cochrane's conversation with Ryan, he called over a number of other male coworkers. Ryan asked each of them how much money they were making, and when they

all stated that they were earning $9.00 per hour or more, Ryan mocked Ms. Cochrane and the other women present.

91. Ms. Cochrane left Walmart in August of 2005.

92. In the fall of 2008, Ms. Cochrane worked at Walmart again. She took the job, hoping Walmart's pay disparity and promotion discrimination had changed. However, in a few short weeks, Ms. Cochrane learned that Walmart's practices of pay disparity and promotion discrimination still continued. She resigned her employment shortly thereafter.

## FIRST CLAIM FOR RELIEF
### (Pay Discrimination in Violation Title VII)

93. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

94. Over a time period spanning many years, including the time Ms. Cochrane worked at Walmart, the company acted with deliberate indifference toward its obligation to make job wage decisions without regard to gender.

95. Walmart repeatedly chose to pay males more than females because of their gender.

96. Walmart refused to pay Ms. Cochrane in accordance with her male counterparts.

97. Walmart discriminated against Ms. Cochrane on the basis of gender and treated her differently than a male employee.

98. As a result of the Walmart's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, Ms. Cochrane is entitled to damages, including lost wages; compensatory damages; emotional distress damages; prejudgment interest; and attorneys' fees and costs expended in this action.

99. Walmart's unlawful conduct toward Ms. Cochrane was done with reckless disregard for her federally protected rights, and as such, Walmart should be subject to punitive damages as well.

## SECOND CLAIM FOR RELIEF
### (Promotion Discrimination in Violation of Title VII)

100. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

101. Walmart is an extremely large employer with hundreds of employees in each store and thousands of employees within the State of Utah.

102. Over a time period spanning many years, including the time Ms. Cochrane worked at Walmart, the company acted with deliberate indifference toward its obligation to make employment promotion decisions without regard to gender.

103. Walmart refused to promote Ms. Cochrane into a permanent position, instead promoting a male employee with far less experience and lesser relevant credentials.

104. Walmart discriminated against Ms. Cochrane on the basis of gender and treated her differently than a male employee.

105. As a result of the Walmart's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, Ms. Cochrane is entitled to damages, including lost wages; compensatory damages; emotional distress damages; prejudgment interest; and attorneys' fees and costs expended in this action.

106. Walmart's unlawful conduct toward Ms. Cochrane was done with reckless disregard for her federally protected rights, and as such, Walmart should be subject to punitive damages as well.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award the following relief:

a. For Plaintiff's lost wages, compensation, and benefits;

b. For compensatory damages;

c. For general damages including emotional distress;

d. For punitive damages;

e. For Plaintiff's reasonable attorneys' fees, including expert witness fees as provided by 42 U.S.C. §1988 and 42 U.S.C. §2000e-5;

f. For pre-judgment and post-judgment interest at the highest lawful rate;

g. For costs of court and such other relief as the court deems just and equitable,

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 19th day of December, 2019.

                **STRINDBERG & SCHOLNICK, LLC**

                /s/ Kass Harstad
                Attorneys for Plaintiff